1
**REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
2
mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
3
adhoover@reichradcliffe.com
4675 MacArthur Court, Suite 550
4
Newport Beach, CA 92660
Phone:  (949) 975-0512
5
Fax: (949) 208-2839

6
**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz (*Pro Hac Vice to be submited*)
7
jml@jlclasslaw.com
821 Franklin Ave., Suite 209
8
Garden City, NY 11530
Phone: (516) 493-9780
9
Fax: (516) 280-7376

10
Attorneys for Plaintiff

11
**UNITED STATES DISTRICT COURT**

12
**NORTHERN DISTRICT OF CALIFORNIA**

13

14
TAMMY RAUL, Individually and on Behalf of All Others Similarly Situated,

15
            Plaintiff,

16
v.

17
CAVIUM, INC.
SYED B. ALI,
18
BRAD W. BUSS,
EDWARD H. FRANK
19
SANJAY MEHROTRA,
MADHAV V. RAJAN,
20
ANTHONY S. THORNLEY,
MARVELL TECHNOLOGY GROUP LTD.,
21
KAUAI ACQUISITION CORP.,

22
            Defendants,

23

Case No: 3:18-cv-00139

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(A) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Demand for Jury Trial**

24

25

26

27

28

Plaintiff Tammy Raul ("Plaintiff") by and through her undersigned attorneys, brings this class action on behalf of herself and all others similarly situated, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Cavium, Inc. ("Cavium" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Cavium's website concerning the Company's public statements; and (d) review of other publicly available information concerning Cavium and the Defendants.

## SUMMARY OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of herself and the other public holders of the common stock of Cavium against the Company and the members of the Company's board of directors (the "Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Cavium to Marvell Technology Group Ltd. ("Marvell").

2.      On November 20, 2017, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Marvell, a Bermuda exempted company, and Kauai Acquisition Corp. ("Merger Sub"), a Delaware corporation and wholly owned indirect subsidiary of Marvell, providing for the merger of Merger Sub with and into Cavium, with Cavium surviving as a wholly owned indirect subsidiary of Marvell (the "Proposed Merger")..

3.      In connection with the Proposed Merger, each share of Cavium common stock issued and outstanding will have the right to receive $40.00 in cash and 2.1757 Marvell common shares for each Cavium share (the "Merger Consideration").

4.      The consummation of the Proposed Merger is subject to certain closing conditions, including the approval of the stockholders of Cavium.  The Company expects the Proposed Merger to close in mid-calendar 2018.

5.      On December 21, 2017, in order to convince Cavium shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a joint materially incomplete and misleading registration statement, which was filed by Marvell on Form S-4 with the SEC (the "S-4" or the "Registration Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

6.      While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the S-4, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the S-4 incomplete and misleading.

7.      It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.

8.      Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Cavium stockholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) Cavium's principal executive offices are located in this District at 2315 N. First Street, San Jose, California 95131; (iii) each of the Individual Defendants, and Company officers and/or directors, either resides in this District or has extensive contacts within this District; (iv) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (v) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (vi) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.     Plaintiff Tammy Raul ("Plaintiff") is, and at all relevant times has been, a Cavium stockholder.

13.     Defendant Cavium, Inc. ("Cavium" or the "Company") is a Delaware corporation with its principal executive offices located at 2315 N. First Street, San Jose, California 95131.  Cavium's common stock is listed on the NASDAQ under the ticker symbol "CAVM."

14.     Defendant Syed B. Ali ("Ali") is one of the founders of the Company and has been the President, Chief Executive Officer ("CEO") and Chairman of the Board since 2000.

15.     Defendant Brad W. Buss ("Buss") has been a director of the Company since July 2016.

16.     Defendant Edward H. Frank ("Frank") has been a director of the Company since July 2016.

17.     Defendant Sanjay Mehrotra ("Mehrotra") has been a director of the Company since July 2009.

18.     Defendant Madhav V. Rajan ("Rajan") has been a director of the Company since March 2013.

19.     Defendant Anthony S. Thornley ("Thornley") has been a director of the Company since September 2006.

20. Defendants Ali, Buss, Frank, Mehrotra, Rajan and Thornley are collectively referred to herein as the "Individual Defendants."

21. Defendant Marvell Technology Group Ltd. ("Marvell") is a Bermuda corporation with its principal executive offices located at Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda. Marvell's stock trades on the NASDAQ under the ticker symbol "MRVL."

22. Defendant Kauai Acquisition Corp. ("Merger Sub") is a Delaware corporation and wholly owned indirect subsidiary of Marvell created for the purpose of effecting the Proposed Merger.

23. The Individual Defendants, Cavium, Marvell and Merger Sub are collectively referred to as the "Defendants."

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public stockholders of Cavium (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

25. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. As of November 1, 2017, there were approximately 69,135,991 shares of Cavium common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Cavium will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i. whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act;

    ii. whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii. whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading S-4.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

26.    Cavium was founded in 2000 and designs, develops, and markets semiconductor processors for intelligent and secure networks in the United States and internationally. The Company offers integrated semiconductor processors that enable intelligent processing for wired and wireless infrastructure and cloud for networking, communications, storage, and security applications.  Cavium primarily sells its products to original equipment manufacturers directly or through their contract manufacturers and through channels and original design manufacturers, as well as directly to mega data centers.

### The Flawed Process Leading to the Merger Agreement

27.    In March and April 2017, defendant Ali, the Co-Founder, President, CEO and Chairman of the Board met with Matt Murphy ("Murphy"), President and CEO of Marvell, and discussed potential partnering opportunities and the possibility of a potential strategic transaction.

28.    In May 2017, Gary Ignatin, Senior Vice President, Corporate Development of Marvell, contacted Goldman Sachs to act as financial advisor to Marvell in connection with Marvell's

evaluation of certain potential strategic transactions, including a potential transaction between Marvell and Cavium.

29.    In early June 2017, Marvell contacted a representative of Hogan Lovells US LLP ("Hogan Lovells") to act as outside counsel to Marvell in connection with Marvell's evaluation of certain potential strategic transactions, including a potential transaction between Marvell and Cavium.

30.    On June 12, 2017, Ali and Murphy discussed a potential strategic transaction between Marvell and Cavium.

31.    Between June 13, 2017 and November 17, 2017, Ali discussed with the Board Marvell's potential interest in a strategic transaction and engaging financial advisors to help evaluate a potential strategic transaction with Marvell or other potentially interested parties.

32.    On June 16, 2017, Marvell's board of directors met and discussed a potential strategic transaction with Cavium and authorized management to submit a preliminary non-binding proposal to acquire Cavium.

33.    On July 18, 2017, Ali and Murphy met and discussed the concept of an "illustrative" potential strategic transaction where Marvell would purchase all of the outstanding shares of Cavium common stock at a price of $72 per share. Multiple scenarios were discussed for the potential transaction, including the potential mix of cash and stock. Ali indicated that the "illustrative" price per share undervalued Cavium.

34.    Also on July 18, 2017, Ali contacted J.P. Morgan to act as a financial co-advisor to Cavium.

35.    On July 19, 2017, Marvell sent a draft mutual non-disclosure agreement with respect to a potential strategic transaction to Cavium.

36.    On July 20, 2017, Ali contacted a representative of Qatalyst Partners to act as a financial co-advisor to Cavium.

37.    On July 21, 2017, Marvell and Cavium entered into a mutual non-disclosure agreement with respect to a potential strategic transaction.

38.    On July 26, 2017, Chadwick, the CFO of Cavium, met with Jean Hu, the CFO of Marvell, to discuss the framework for quantifying potential synergies in connection with a potential strategic transaction.

39.    On August 4, 2017, Ali, Chadwick and Raghib Hussain, the Co-Founder and COO of Cavium, met Murphy, and discussed the potential benefits of a strategic transaction between Cavium and Marvell. The parties provided high-level overviews of their respective businesses and discussed Marvell's interest in, and next steps towards, a potential strategic transaction with Cavium.

40.    Between August 8, 2017 and November 17, 2017, Murphy regularly provided e-mail and telephonic updates to Marvell's board of directors.

41.    On August 11, 2017, Marvell's board of directors met and authorized Marvell's management to continue to pursue a potential strategic transaction with Cavium and to submit a preliminary non-binding proposal to acquire Cavium.

42.    On August 25, 2017, Marvell sent a preliminary non-binding proposal to purchase all of Cavium's outstanding common stock at a price of $72 per share, $52 in cash and the remaining $20 paid in Marvell common shares. Ali informed Murphy that this proposal undervalued Cavium.

43.    Also on August 25, 2017, Robert Switz, a member of Marvell's board of directors, had a telephone call with Sanjay Mehrotra, a member of Cavium's Board.  During the call, Switz indicated that Marvell continued to be interested in pursuing a potential strategic transaction with Cavium.

44.    On September 26, 2017, Murphy delivered to Ali a preliminary, written non-binding indication of interest for Marvell to purchase all of the outstanding shares of Cavium common stock at a price of $75 per share, with 50% paid in cash and 50% paid in Marvell common shares. Ali told Murphy that Marvell's indication of interest still undervalued Cavium.

45.    Also on September 26, 2017, Murphy encountered Hussain at an industry event and discussed the potential strategic transaction between Marvell and Cavium.

46.    On October 3, 2017, Ali informed Murphy that Cavium would not accept Marvell's preliminary non-binding indication of interest and urged Mr. Murphy to increase Marvell's proposed consideration.

47.     On October 5, 2017, Switz met with Mehrotra and discussed the potential strategic transaction between Marvell and Cavium.

48.     On October 12, 2017, Marvell proposed a revised written non-binding indication of interest to purchase all of the outstanding shares of Cavium common stock at a price of $76.75 per share, of which 50% would be paid in cash and 50% would be paid in Marvell common shares.  Ali informed Murphy that Marvell's proposal still undervalued Cavium.

49.     Also on October 12, 2017, Cavium's Board met and directed management to seek a purchase price of $83.50 per share without specifying the mix of consideration but authorized management to convey that a 50/50 mix of stock and cash would be acceptable.

50.     On October 13, 2017, Cavium informed Marvell that the $76.75 per share proposal was unacceptable, and indicated that a purchase price of $83.50 per share would be acceptable to Cavium.

51.     On October 14, 2017, Marvell asked Cavium to decrease the purchase price of Cavium's most recent counterproposal of $83.50 per share. Ali declined to decrease the proposal as requested.

52.     On October 19, 2017, Ali informed Murphy that he believed Cavium's Board would not accept a proposal below the "low $80s per share."

53.     Later on October 19, 2017, Cavium's Board met and reaffirmed their interest in pursuing a potential transaction with Marvell but directed management to seek a purchase price of $80.50 per share and authorized management to accept a revised indication of interest from Marvell of $80.00 per share or higher. The Board also authorized Cavium's management and representatives of Qatalyst Partners and J.P. Morgan to contact certain third parties who might have an interest in engaging in a strategic transaction with Cavium.

54.     Also on October 19, 2017, Qatalyst Partners contacted a representative of Party A about pursuing a potential strategic transaction involving Cavium.

55.     On October 20, 2017, Qatalyst Partners contacted Party B about pursuing a potential strategic transaction involving Cavium. Party B informed Qatalyst Partners that Party B was not interested in pursuing a potential strategic transaction involving Cavium.

56.     Also on October 20, 2017, Ali contacted Party C about pursuing a potential strategic transaction involving Cavium.

57.     Also on October 20, 2017, J.P. Morgan contacted representatives of Party D about pursuing a potential strategic transaction involving Cavium. Representatives of Party D expressed initial interest.

58.     Also on October 20, 2017, Qatalyst Partners contacted a representative of Party E, about pursuing a potential strategic transaction involving Cavium.  Party E informed Qatalyst Partners that Party E was not interested in pursuing a potential strategic transaction involving Cavium.

59.     On October 22, 2017, Parties A and C informed Qatalyst Partners that they were not interested in pursuing a potential strategic transaction with Cavium.

60.     On October 24, 2017, Ali informed Murphy that a purchase price of $80.75 per share would be acceptable to Cavium and proposed that three members of Cavium's Board join Marvell's board of directors at the closing of the proposed transaction.

61.     On October 25, 2017, Marvell sent a revised proposal to purchase all of Cavium's outstanding common stock at a price of $80.00 per share, of which 50% would be paid in cash and 50% would consist of Marvell common shares, subject to Marvell declaring a one-time dividend of $0.50 per Marvell common share payable to Marvell shareholders prior to the closing of the proposed transaction between Marvell and Cavium.

62.     On October 26, 2017, Cavium's Board met and reaffirmed their interest in pursuing a potential transaction with Marvell but directed management to seek a higher purchase price of $80.00 per share.

63.     Also on October 26, 2017, Ali informed Murphy that Cavium would not accept Marvell's revised proposal and that the Board authorized him only to accept $80.00 per share.

64.     Also on October 26, 2017, Party D informed J.P. Morgan that there could be a strategic fit between Party D and Cavium, but that Party D was not interested due to various regulatory concerns.

65.     On October 27, 2017, Murphy conveyed to Ali a revised proposal for Marvell to purchase Cavium for $80.00 per share, with 50% paid in cash and 50% paid in Marvell common shares, without a stipulation that Marvell have the right to declare a one-time dividend of $0.50 per

Marvell common share payable to Marvell shareholders prior to the closing of the proposed transaction.

66.    Also on November 2, 2017, Cavium's Board met and noted Party A, Party B, Party C, Party D and Party E had all indicated that they were not interested in pursuing a potential strategic transaction with Cavium at that time.

67.    Also on November 2, 2017, Cavium made available to Marvell an online data room.

68.    On November 4, 2017, Cavium and Marvell entered into an amendment to the non-disclosure agreement, which included a customary nine-month non-solicitation provision and a customary nine-month standstill provision, as well as an exclusivity agreement.

69.    Also on November 4, 2017, Marvell made available to Cavium an online data room.

70.    On November 8, 2017, Company F contacted Ali regarding a potential business combination of Cavium and Company F.  Ali did not respond to Party F due to Cavium's obligations under the exclusivity agreement with Marvell.

71.    On November 9, 2017, Cavium's Board met and discussed Party F's expression of interest regarding a potential business combination with Cavium, and certain management projections and forecasts for Cavium, forecasts for Marvell and forecasts relating to anticipated synergies.

72.    Throughout November 2017, Cavium's and Marvell's representatives exchanged various revised draft merger agreements.

73.    On November 19, 2017, Cavium's Board met and determined that the merger agreement and the transactions contemplated thereby were advisable, fair to and in the best interests of Cavium and Cavium's shareholders, and authorized management to execute the final definitive agreement with Marvell.

### The Company Announces the Proposed Merger

74.    On November 20, 2017, the Company issued a press release and current report on Form 8-K with the SEC announcing the Proposed Merger:

**Marvell and Cavium to Combine Creating an Infrastructure Solutions Powerhouse**

**- Complementary portfolios and scale enable world-class end-to-end solutions**
**- Diversifies revenue base and end markets; increases SAM to $16 billion+**

**- Combined R&D innovation engine and IP portfolio accelerates product leadership**
**- Creates best-in-class financial model**

**Santa Clara, and San Jose Calif. (November 20, 2017)** –Marvell Technology Group Ltd. (NASDAQ: MRVL) and Cavium, Inc. (NASDAQ: CAVM) today announced a definitive agreement, unanimously approved by the boards of directors of both companies, under which Marvell will acquire all outstanding shares of Cavium common stock in exchange for consideration of $40.00 per share in cash and 2.1757 Marvell common shares for each Cavium share. Upon completion of the transaction, Marvell will become a leader in infrastructure solutions with approximately $3.4 billion1 in annual revenue.

The transaction combines Marvell's portfolio of leading HDD and SSD storage controllers, networking solutions and high-performance wireless connectivity products with Cavium's portfolio of leading multi-core processing, networking communications, storage connectivity and security solutions. The combined product portfolios provide the scale and breadth to deliver comprehensive end-to-end solutions for customers across the cloud data center, enterprise and service provider markets, and expands Marvell's serviceable addressable market to more than $16 billion. This transaction also creates an R&D innovation engine to accelerate product development, positioning the company to meet today's massive and growing demand for data storage, heterogeneous computing and high-speed connectivity.

"This is an exciting combination of two very complementary companies that together equal more than the sum of their parts," said Marvell President and Chief Executive Officer, Matt Murphy. "This combination expands and diversifies our revenue base and end markets, and enables us to deliver a broader set of differentiated solutions to our customers. Syed Ali has built an outstanding company, and I'm excited that he is joining the Board. I'm equally excited that Cavium's Co-founder Raghib Hussain and Vice President of IC Engineering Anil Jain will also join my senior leadership team. Together, we all will be able to deliver immediate and long-term value to our customers, employees and shareholders."

"Individually, our businesses are exceptionally strong, but together, we will be one of the few companies in the world capable of delivering such a comprehensive set of end-to-end solutions to our combined customer base," said Cavium Co-founder and Chief Executive Officer, Syed Ali. "Our potential is huge. We look forward to working closely with the Marvell team to ensure a smooth transition and to start unlocking the significant opportunities that our combination creates."

The transaction is expected to generate at least $150 to $175 million of annual run-rate synergies within 18 months post close and to be significantly accretive to revenue growth, margins and non-GAAP EPS.

**Transaction Structure and Terms**

Under the terms of the definitive agreement, Marvell will pay Cavium shareholders $40.00 in cash and 2.1757 Marvell common shares for each share of Cavium common stock. The exchange ratio was based on a purchase price of $80 per share, using Marvell's undisturbed price prior to November 3, when media reports of the transaction first surfaced. This represents a transaction value of approximately $6 billion. Cavium shareholders are expected to own approximately 25% of the combined company on a pro forma basis.

Marvell intends to fund the cash consideration with a combination of cash on hand from the combined companies and $1.75 billion in debt financing. Marvell has obtained commitments consisting of an $850 million bridge loan commitment and a $900 million committed term loan from Goldman Sachs Bank USA and Bank of America Merrill Lynch, in each case, subject to customary terms and conditions. The transaction is not subject to any financing condition.

The transaction is expected to close in mid-calendar 2018, subject to regulatory approval as well as other customary closing conditions, including the adoption by Cavium shareholders of the merger agreement and the approval by Marvell shareholders of the issuance of Marvell common shares in the transaction.

**Management and Board of Directors**

Matt Murphy will lead the combined company, and the leadership team will have strong representation from both companies, including Marvell's current Chief Financial Officer Jean Hu, Cavium's Co-founder and Chief Operating Officer Raghib Hussain and Cavium's Vice President of IC Engineering Anil Jain. In addition, Cavium's Co-founder and Chief Executive Officer, Syed Ali, will continue with the combined company as a strategic advisor and will join Marvell's Board of Directors, along with two additional board members from Cavium's Board of Directors, effective upon closing of the transaction.

75. Goldman Sachs & Co. LLC ("Goldman Sachs") served as the exclusive financial advisor to Marvell and Hogan Lovells US LLP ("Hogan Lovells") served as legal advisor.

76. Qatalyst Partners LP ("Qatalyst Partners") and J.P. Morgan Securities LLC ("J.P. Morgan") served as financial advisors to Cavium and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") served as legal advisor.

**The Preclusive Deal Provisions**

77. In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Cavium.

78. Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish Marvell with the terms of any competing bid and confidentiality agreement; (iii) a matching rights provision which gives Marvell four (4) business days to match any unsolicited superior acquisition proposal the Board

1  receives; and (iv) a provision that requires the Company to pay Marvell a termination fee of $180

2  million.

3     79.    These deal protection provisions, particularly when considered collectively, substantially

4  and improperly limited the Board's ability to act with respect to investigating and pursuing superior

5  proposals and alternatives, including a sale of all or part of Cavium.

6     80.    Given that the preclusive deal protection provisions in the Merger Agreement impede a

7  superior bidder from emerging, it is imperative that Cavium's shareholders receive all material

8  information necessary for them to cast a fully informed vote at the shareholder meeting concerning the

9  Proposed Merger.

10    **Interests of the Officers and Directors of Cavium to Completing the Proposed Merger**

11    81.    Certain of the officers and/or directors of the Company have significant financial

12  interests in completing the Proposed Merger.  The following chart, taken from the S-4, shows the

13  potential payouts to Cavium's officers and directors as a result of their exchange of shares of Cavium

14  for the Merger Consideration:

| Name | Number of Shares of Cavium Common Stock Owned | Share Consideration Payable in Marvell Common Shares | Cash Consideration Payable in Respect of Shares of Cavium Common Stock |
|---|---|---|---|
| **Named Executive Officers** | | | |
| Syed B. Ali | 1,726,075 | 3,755,421 | $   69,043,008 |
| M. Raghib Hussain | 245,442 | 534,008 | $    9,817,684 |
| Arthur D. Chadwick | — | — | $          — |
| Anil K. Jain | 45,074 | 98,067 | $    1,802,971 |
| Vincent P. Pangrazio | 7,663 | 16,752 | $      306,529 |
| **Non-Employee Directors** | | | |
| Brad Buss | 7,700 | 16,752 | $      308,020 |
| Edward H. Frank | 5,200 | 11,313 | $      208,014 |
| Sanjay Mehrotra | 69,208 | 150,575 | $    2,768,339 |
| Madhav V. Rajan | 26,208 | 57,020 | $    1,048,336 |
| Anthony Thornley | 5,208 | 11,331 | $      208,321 |

**Interests of the Financial Advisors to the Proposed Merger**

82.    Goldman Sachs acted as financial advisor to Marvell in connection with, and participated

in certain of the negotiations leading to, the transactions contemplated by the Merger Agreement. At

the request of Marvell, an affiliate of Goldman Sachs entered into financing commitments and

agreements to provide Marvell with a $900 million three-year term loan facility and an $850 million 364-day bridge facility.

83.     Marvell estimates that Goldman Sachs and its affiliates will in the aggregate receive approximately $10 million in fees in connection with the bridge loan facility, term loan facility and permanent debt financing.

84.     Pursuant to a letter agreement dated November 11, 2017, Marvell engaged Goldman Sachs to act as its financial advisor in connection with the contemplated transaction. The engagement letter between Marvell and Goldman Sachs provides for a transaction fee of $22,000,000, of which $5,000,000 became payable upon execution of the Merger Agreement, and the remainder of which is contingent upon completion of the Merger.

85.     Under the terms of its engagement letter, Qatalyst Partners provided Cavium with financial advisory services in connection with the Proposed Merger for which it will be paid approximately $38 million (provided that the final actual fee will be, in part, based on an average of Marvell's closing share price over ten consecutive trading days up to and including the second trading day immediately preceding the closing date of the Proposed Merger, and, accordingly, the final fee may vary significantly from this estimate), $150,000 of which became payable upon the execution of its engagement letter, $3.5 million of which became payable upon delivery of its opinion, and the remaining portion of which will be paid upon, and subject to, the completion of the Proposed Merger.

86.     For services rendered in connection with the Proposed Merger, Cavium agreed to pay J.P. Morgan a fee of approximately $25 million, of which $3.5 million became payable upon delivery of its fairness opinion and the remainder will be payable upon completion of the Proposed Merger.

**FALSE AND MISLEADING STATEMENTS**

**AND/OR MATERIAL OMISSIONS IN THE REGISTRATION STATEMENT**

87.     On December 21, 2017, Marvell filed the joint proxy statement (reviewed and approved by Cavium's Board) on a Form S-4 registration statement with the SEC in connection with the Proposed Merger (the "S-4" or the "Registration Statement") containing background information and the financial analyses prepared by Qatalyst Partners and J.P. Morgan for Cavium and Goldman Sachs for Marvell in support of their fairness opinions favoring the Proposed Merger. The S-4 solicits the

Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material false and misleading statements or material misrepresentations or omissions. However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Financial Projections Prepared by Cavium's Management

88.    In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

89.    In order to make the projections included on pages 111-116 of the S-4 materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

90.    At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) net income; (ii) net earnings; (iii) earnings per share; (iv) interest expense; (v) depreciation and amortization; (vi) amortization of intangibles; and (vii) a reconciliation of all non-GAAP to GAAP metrics.  Such

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto- profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

projections are necessary to make the non-GAAP projections included in the S-4 not misleading and leaves Cavium shareholders without the necessary, material information to reach a full-informed decision concerning the Company, the fairness of the merger consideration, and, ultimately, whether to vote in favor of the Proposed Merger.

91.    The S-4 provides several projections for non-GAAP metrics, including EBITDA and Unlevered Free Cash Flow, but fails to disclose necessary line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures for the following: (i) Cavium Management Projections of Cavium Financial Information; and (ii) Cavium Management Adjustment of Marvell Prospective Financial Information.

92.    Failure to provide complete and full disclosure of the line item projections for the metrics used to calculate the above-mentioned non-GAAP metrics leave Cavium shareholders without the necessary, material information to reach a fully-informed decision concerning the Company, fairness of the merger consideration, and whether to vote in favor of the Proposed Merger.

93.    Further, Cavium has previously provided its shareholders with the above-mentioned information. For instance, the following chart is excerpted from Cavium's press release on November 1, 2017 concerning the Company's financial results for the third quarter of 2017:

### CAVIUM, INC.

### Unaudited Reconciliation of Non-GAAP Adjustments

**(in thousands, except per share data and percentages)**

| | Three Months Ended | |
| --- | --- | --- |
| | September 30, 2017 | June 30, 2017 |
| **Reconciliation of GAAP income (loss) from operations to non-GAAP income from operations:** | | |
| GAAP income (loss) from operations | $             488 | $        (6,06)0 |
| Stock-based compensation and related payroll taxes | 27,35 1 | 28,3 79 |
| Inventory charges | (18) | 1,66 1 |
| Amortization of acquisition | 29,95 | 29,7 |

| | | | | |
|---|---|---|---|---|
| related assets | | 0 | | 14 |
| Acquisition and integration related costs | | 4,740 | | 2,795 |
| Non-GAAP income from operations | $ | 62,511 | $ | 56,489 |
| Non-GAAP income from operations as a percentage of revenue | | 24.8% | | 23.3% |

| Reconciliation of GAAP net loss to non-GAAP net income: | | | | |
|---|---|---|---|---|
| GAAP net loss | $ | (6,214) | $ | (11,072) |
| Non-GAAP adjustments: | | | | |
| Stock-based compensation and related payroll taxes | | 27,351 | | 28,379 |
| Inventory charges | | (18) | | 1,661 |
| Amortization of acquisition related assets | | 29,950 | | 29,714 |
| Acquisition and integration related costs | | 4,740 | | 2,795 |
| Acquisition related tax adjustments | | - | | (2,605) |
| Total of non-GAAP adjustments | | 62,023 | | 59,944 |
| Non-GAAP net income | $ | 55,809 | $ | 48,872 |
| | | | | |
| GAAP net loss per share, diluted | $ | (0.09) | $ | (0.16) |
| Non-GAAP adjustments detailed above | | 0.85 | | 0.83 |
| Non-GAAP net income per share, diluted | $ | 0.76 | $ | 0.67 |
| | | | | |
| GAAP weighted average shares, diluted | | 68,675 | | 68,199 |
| Non-GAAP share adjustment | | 4,488 | | 5,019 |
| Non-GAAP weighted average shares, diluted | | 73,163 | | 73,218 |

94.    The omission of the above-referenced projections and metrics renders the financial projections included in the S-4 materially incomplete and misleading.  If a proxy or registration

statement soliciting a shareholder vote discloses financial projections and valuation information, such projections must be complete and accurate.

### Financial Projections Prepared by Marvell's Management

95.   The S-4 provides several projections for non-GAAP metrics, including EBITDA and Unlevered Free Cash Flow, but fails to disclose necessary line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures for the following: (i) Marvell Management Projections of Marvell Financial Information; (ii) Marvell Management Adjustment of Cavium Prospective Financial Information; and (iii) Marvell Financial Projections of the Combination of Marvell and Cavium.

96.   Marvell has previously provided its shareholders with the above-mentioned information. For instance, the following chart is excerpted from Marvell's press release on March 2, 2017 concerning its fourth quarter and fiscal year 2017 financial results:

### Marvell Technology Group Ltd.

### Reconciliations from GAAP to Non-GAAP (Unaudited)

### (In thousands, except per share amounts)

| | Three Months Ended | | | Year Ended | |
|---|---|---|---|---|---|
| | January 28, 2017 | October 29, 2016 | January 30, 2016 | January 28, 2017 | January 30, 2016 |
| GAAP gross profit from continuing operations: | $    327,517 | $    357,779 | $    310,225 | $    1,288,147 | $    1,206,699 |
| Special items: | | | | | |
|     Share-based compensation | 1,641 | 2,189 | 1,826 | 8,334 | 7,787 |
|     Restructuring and other related charges *(a)* | — | — | 7 | — | 10,292 |
|     Amortization of and write-off acquired intangible assets | — | — | — | | 733 |
|     Other cost of good sold *(b)* | — | — | 3,710 | — | 84,558 |
| Total special items | 1,641 | 2,189 | 5,543 | 8,334 | 103,370 |
| Non-GAAP gross profit | $    329,158 | $    359,968 | $    315,768 | $    1,296,481 | $    1,310,069 |
| GAAP gross margin from continuing operations | 57.3% | 57.1% | 51.5% | 55.6% | 45.5% |
| Non-GAAP gross margin | 57.6% | 57.5% | 52.4% | 55.9% | 49.5% |

| | | | | | |
|---|---|---|---|---|---|
| Total GAAP operating expenses from continuing operations | $ 339,650 | $ 270,195 | $ 295,292 | $ 1,188,153 | $ 1,982,204 |
| Special items: | | | | | |
|     Share-based compensation | (20,764) | (23,826) | (28,365) | (96,426) | (118,174) |
|     Restructuring and other related charges *(a)* | (98,860) | (1,164) | (4,389) | (105,186) | (53,251) |
|     Amortization of and write-off acquired intangible assets | (1,480) | (2,299) | (2,300) | (8,376) | (10,098) |
|     CMU Litigation settlement | — | — | — | — | (654,667) |
|     Other operating expenses *(c)* | (315) | — | (6,836) | (1,544) | (43,914) |
| Total special items | (121,419) | (27,289) | (41,890) | (211,532) | (880,104) |
| Total non-GAAP operating expenses | $ 218,231 | $ 242,906 | $ 253,402 | $ 976,621 | $ 1,102,100 |
| GAAP net income (loss) | $ (80,091) | $ 72,616 | $ 4,200 | $ 21,151 | $ (811,400) |
|     Net loss from discontinued operations | 3,214 | 4,838 | 12,973 | 22,843 | 42,245 |
| GAAP net income (loss) from continuing operations | (76,877) | 77,454 | 17,173 | 43,994 | (769,155) |
| Special items: | | | | | |
|     Share-based compensation | 22,405 | 26,015 | 30,191 | 104,760 | 125,961 |
|     Restructuring and other related charges *(a)* | 98,860 | 1,164 | 4,396 | 105,186 | 63,543 |
|     Amortization of and write-off acquired intangible assets | 1,480 | 2,299 | 2,300 | 8,376 | 10,831 |
|     CMU Litigation settlement | — | — | — | — | 654,667 |
|     Other operating expenses *(c)* | 315 | — | 10,546 | 1,544 | 128,472 |
| Pre-tax total special items | 123,060 | 29,478 | 47,433 | 219,866 | 983,474 |
| Non-GAAP income before income taxes | 46,183 | 106,932 | 64,606 | 263,860 | 214,319 |
| Tax effect of special items *(d)* | 67,989 | — | — | 66,918 | 11,511 |
| Non-GAAP net income from continuing operations | $ 114,172 | $ 106,932 | $ 64,606 | $ 330,778 | $ 225,830 |
| Weighted average shares — basic | 507,834 | 511,090 | 506,352 | 509,738 | 510,945 |
| Weighted average shares — diluted | 507,834 | 522,091 | 508,590 | 517,513 | 510,945 |
| Non-GAAP weighted average shares — diluted | 528,141 | 531,831 | 518,568 | 527,197 | 526,294 |
| GAAP diluted net income (loss) per share from continuing operations | $ (0.15) | $ 0.15 | $ 0.03 | $ 0.09 | $ (1.51) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Non-GAAP diluted net income per share from continuing operations | $ | 0.22 | $ | 0.20 | $ | 0.12 | $ | 0.63 | $ | 0.43 |

### Goldman Sachs' Analyses and Fairness Opinion

97.     With respect to Goldman Sachs' *Selected Companies Analysis*, the S-4 fails to disclose: (i) the basis or parameters used, if any, for Goldman Sachs' determination that (a) the transactions selected were similar for purposes of the analysis and (b) the financial information of the selected companies were similar for purposes of the analysis; (ii) the reasons for specifically excluding Nvidia Corporation's financial information in the analysis; (iii) the parameters for determining the market size and product profile for the selected companies; (iv) the inputs and specific information used by Goldman Sachs in calculating NTM P/E Ratio for each of the (a) Cavium Selected Companies and (b) Marvell Selected Companies; and (v) the inputs and specific information used by Goldman Sachs in calculating the NTM EV/EBITDA Multiple for each of the selected companies.

98.     With respect to Goldman Sachs' *Selected Transactions Analysis*, the S-4 fails to disclose: (i) the reasons or criteria used for each of the selected transactions; (ii) the NTM Transaction Revenue Multiple for each of the selected transactions; (iii) the NTM Transaction EBITDA Multiple for each of the selected transactions; (iv) the NTM Transaction P/E Ratio for each of the selected transactions; and (v) the reasons for selecting an illustrative range of NTM Transaction P/E ratios of 20.0x to 30.0x.

99.     With respect to Goldman Sachs' *Premia Analysis*, the S-4 fails to disclose the implied premium for each of the selected transactions.

100.   With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the S-4 fails to disclose: (i) how Goldman Sachs determined the weighted average cost of capital; (ii) the reasons for applying perpetuity growth rates ranging from 4.0% to 6.0%; and (iii) the reasons for applying implied exit terminal year next twelve months' EBITDA multiples ranging from 6.8x to 16.6x.

### Goldman Sachs' Analyses of Marvell (Stand-Alone and Pro Forma)

101.   With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* of Marvell on a stand-alone basis, the S-4 fails to disclose how Goldman Sachs determined, and the reasons for

using, the following numbers and ranges: (i) discount rates ranging from 9.5% to 11.5%; (ii) the weighted average cost of capital; (iii) estimates of unlevered free cash flow for the second half of fiscal year 2018; (iv) perpetuity growth rates ranging from 2.0% to 4.0%; and (v) implied exit terminal year next twelve months' EBITDA multiples ranging from 8.7x to 14.7x.

102.  With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* of Marvell pro forma, the S-4 fails to disclose how Goldman Sachs determined, and the reasons for using, the following numbers and ranges: (i) discount rates ranging from 10.0% to 12.0%; (ii) perpetuity growth rates ranging from 3.5% to 5.5%; and (iii) implied exit terminal year next twelve months' EBITDA multiples ranging from 9.5x to 17.4x.

103.  With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* of Marvell on a stand-alone basis, the S-4 fails to disclose the reasons for using an illustrative discount rate of 10.2%.

104.  With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* of Marvell pro forma, the S-4 fails to disclose: (i) the reasons for applying a range of next twelve months' price-to-earnings per share multiples of 15.0x to 17.0x; and (ii) the reasons for applying an illustrative discount rate of 11.3%.

**Qatalyst Partners' Analyses and Fairness Opinion**

105.  With respect to Qatalyst Partners' *Illustrative Discount Cash Flow Analysis* of Cavium as a standalone company, the S-4 fails to disclose how Qatalyst Partners determined and the reasons for applying a range of discount rates of 9.5% to 13.5%.

106.  With respect to Qatalyst Partners' pro forma *Illustrative Discount Cash Flow Analysis* with respect to Marvel, taking into account the Proposed Merger, the S-4 fails to disclose how Qatalyst Partners determined and the reasons for applying a range of discount rates of 9.0% to 12.5%.

**J.P. Morgan's Analyses and Fairness Opinion**

107.  With respect to J.P. Morgan's *Discount Cash Flow Analysis* for Cavium, the S-4 fails to disclose the reasons J.P. Morgan applied the following rates: (i) a 3.0% terminal growth rate in the industry in which Cavium operates in; (ii) terminal growth rates ranging from 2.5% to 3.5% to the

unlevered free cash flows; and (iii) discount rates ranging from 9.0% to 11.0%, based upon an analysis of the weighted average cost of capital of Cavium.

108.   With respect to J.P. Morgan's review of *Equity Research Analyst Price Targets*, the S-4 fails to disclose which public equity research analysts for Cavium J.P. Morgan reviewed and the reasons for selecting those analysts.

109.   With respect to the *Discounted Cash Flow Analyses* performed by Goldman Sachs, to Qatalyst Partners, and J.P. Morgan, the omitted information and key inputs are material to Cavium shareholders, and their omission renders the summary of the financial advisors' fairness opinions materially incomplete and misleading.

### Background of the Proposed Merger

110.   The S-4 omits material information relating to the sale process leading up to the Proposed Merger.

111.   The S-4 fails to expressly indicate whether Cavium and Marvell entered into a confidentiality agreement on November 2, 2017, when Cavium made available to Marvell and its representatives an online data room containing certain information concerning Cavium.  Critically, assuming the parties did enter into a confidentiality agreement, whether such agreement contained a don't-ask-don't-waive ("DADW") standstill provision, whether such provision is still in effect and precluding other parties from making a superior offer for the Company.

112.   Likewise, the S-4 states that on November 4, 2017, Marvell made available to Cavium and its representatives an online data room containing certain information concerning Marvell.  Again, the S-4 fails to disclose whether the parties executed a confidentiality agreement and, if so, whether such agreement contained a DADW standstill provision and whether such provision is still in effect.

### COUNT I

### (Against All Defendants for Violations of Section 14(a)

### of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

113.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

114.   Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national

securities exchange or otherwise, in contravention of such rules and regulations as the Commission

may prescribe as necessary or appropriate in the public interest or for the protection of investors, to

solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of

any security (other than an exempted security) registered pursuant to section 78l of this title." 15

U.S.C. § 78n(a)(1).

115.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act,

provides that communications with stockholders in a recommendation statement shall not contain "any

statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in

order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

116.   The Defendants have issued the S-4 with the intention of soliciting stockholders support

for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the S-

4, which fails to provide critical information regarding, among other things, the financial projections

for the Company and the fairness opinion of Cavium's financial advisor, UBS.

117.   In so doing, Defendants made untrue statements of fact and/or omitted material facts

necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles

as officers and/or directors, were aware of the omitted information but failed to disclose such

information, in violation of Section 14(a). The Defendants were therefore negligent, as they had

reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but

nonetheless failed to obtain and disclose such information to stockholders although they could have

done so without extraordinary effort.

118.   The Defendants knew or were negligent in not knowing that the S-4 is materially

misleading and omits material facts that are necessary to render it not misleading. The Defendants

undoubtedly reviewed and relied upon the omitted information identified above in connection with

their decision to approve and recommend the Proposed Merger.

119.   The Defendants knew or were negligent in not knowing that the material information

identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be

materially incomplete and misleading. Indeed, the Defendants were required to be particularly

attentive to the procedures followed in preparing the S-4 and review it carefully before it was

disseminated, to corroborate that there are no material misstatements or omissions.

120.   The Defendants were, at the very least, negligent in preparing and reviewing the S-4. The

preparation of a registration statement by corporate insiders containing materially false or misleading

statements or omitting a material fact constitutes negligence. The Defendants were negligent in

choosing to omit material information from the S-4 or failing to notice the material omissions in the S-

4 upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the

Defendants were intricately involved in the process leading up to the signing of the Merger Agreement

and the preparation of the Company's financial projections.

121.   The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class,

who will be deprived of their right to cast an informed vote if such misrepresentations and omissions

are not corrected prior to the vote on the Proposed Merger.

122.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this

Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and

irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for

### Violations of Section 20(a) of the Exchange Act)

123.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

124.   The Individual Defendants acted as controlling persons of Cavium within the meaning of

Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or

directors of Cavium, and participation in and/or awareness of the Company's operations and/or

intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the

SEC, they had the power to influence and control and did influence and control, directly or indirectly,

the decision making of the Company, including the content and dissemination of the various

statements that Plaintiff contends are materially incomplete and misleading.

125.   Each of the Individual Defendants was provided with, or had unlimited access to, copies

of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

126.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

127.   In addition, as set forth in the S-4 sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

128.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

129.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

130.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

      A.  Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

      B.  Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

      C.  Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

      D.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      E.  Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:      January 8, 2018          **REICH RADCLIFFE & HOOVER LLP**
                                         By: /s/ Adam T. Hoover
                                       Adam T. Hoover

                                       **LIFSHITZ & MILLER**
                                       Edward Miller
                                       Attorneys for Plaintiff

## SWORN CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Tammy Raul, hereby certify that:

1.  Plaintiff has reviewed the complaint and authorized the commencement of a lead plaintiff motion and/or filing of a complaint on plaintiff's behalf.

2.  I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in CAVM securities that are the subject of this litigation during the Class Period are attached hereto as Exhibit A.

5.  I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Executed on 12/29/2017

Signature

**Exhibit A**

My transactions in Cavium, Inc. (CAVM) securities that are the subject of this litigation during the class period set forth in the complaint are as follows ("P" indicates a purchase, "S" indicates a sale):

| Security | Date | Sale | Purchase | Number of Shares | Price per Share |
|----------|------|------|----------|------------------|-----------------|
| CAVM | 2011-08-16 | | P | 16 | $31.48 |